**Slip Op. 02-38**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                           :
THE TIMKEN COMPANY,                        :
                                           :
             Plaintiff,                    :
                                           :
        v.                                 :    Court No.
                                           :    98-12-03235
UNITED STATES,                             :
                                           :
             Defendant,                    :
                                           :
        and                                :
                                           :
PEER BEARING COMPANY,                      :
                                           :
                                           :
                                           :
             Defendant-Intervenor.         :
_____:


        Plaintiff, The Timken Company ("Timken"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Final Results of 1996-1997 Antidumping Duty Administrative Review and New Shipper Review and Determination Not To Revoke Order in Part of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China</u> ("<u>Final Results</u>"), 63 Fed. Reg. 63,842 (Nov. 17, 1998), as amended, <u>Amended Final Results of 1996-1997 Antidumping Duty Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China</u> ("<u>Amended Final Results</u>"), 63 Fed. Reg. 71,447 (Dec. 28, 1998).

        Specifically, Timken contends that Commerce erred in: (1) selecting, for valuing the hot-rolled steel bar used to manufacture tapered roller bearings ("TRBs") cups and cones, export data from Japan to Indonesia, rather than the annual report data from eight Indian bearing producers or Indian import statistics or export statistics from Japan to India; (2) valuing material costs for

steel inputs by using the prices paid by a People's Republic of China ("PRC") bearing producer and a PRC trading company to market-economy suppliers; (3) valuing scrap generated from the production of cups, cones and rollers using unadjusted Indonesian import statistics; and (4) failing to adjust overhead, selling, general and administrative expenses ("SG&A") and profit rates to account for differences in material and labor values of other surrogate sources used in determining normal value ("NV").

**Held**: Timken's 56.2 motion is granted in part and denied in part. This case is remanded to Commerce to: (1) provide the Court with an explanation as to why export statistics from Japan to India are not the "best available information" for the purpose of choosing a surrogate to value hot-rolled steel bar used to produce TRB cups and cones; and (2) explain whether or not the American Metal Market prices can serve as an alternative surrogate to value scrap and, if Commerce concludes that the American Metal Market prices present the "best available information" for the purpose of such surrogate evaluation, to recalculate Commerce's determination accordingly.

[Timken's 56.2 motion is granted in part and denied in part. Case remanded.]

Dated:    April 22, 2002

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr. and Amy S. Dwyer) for Timken.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau); of counsel: Rina Goldenberg, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States.

Arent Fox Kintner Plotkin & Kahn, PLLC (John M. Gurley and Matthew J. McConkey) for Peer Bearing.[1]

---

[1]  Peer Bearing Company has intervened in this action but has not filed a motion for judgment upon the agency record.

**OPINION**

**TSOUCALAS**, **Senior Judge**: Plaintiff, The Timken Company ("Timken"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of 1996-1997 Antidumping Duty Administrative Review and New Shipper Review and Determination Not To Revoke Order in Part of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Final Results"), 63 Fed. Reg. 63,842 (Nov. 17, 1998), as amended, Amended Final Results of 1996-1997 Antidumping Duty Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Amended Final Results"), 63 Fed. Reg. 71,447 (Dec. 28, 1998).

Specifically, Timken contends that Commerce erred in: (1) selecting, for valuing the hot-rolled steel bar used to manufacture tapered roller bearings ("TRBs") cups and cones, export data from Japan to Indonesia, rather than the annual report data from eight Indian bearing producers or Indian import statistics or export statistics from Japan to India; (2) valuing material costs for steel inputs by using the prices paid by a People's Republic of China ("PRC") bearing producer and a PRC trading company to market-economy suppliers; (3) valuing scrap generated from the production

of cups, cones and rollers using unadjusted Indonesian import statistics; and (4) failing to adjust overhead, selling, general and administrative expenses ("SG&A") and profit rates to account for differences in material and labor values of other surrogate sources used in determining normal value ("NV").

## BACKGROUND

This case concerns the 1987 antidumping duty order on TRBs from the PRC for the period of review ("POR") covering June 1, 1996, through May 31, 1997.[2] See Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China ("Antidumping Duty Order"), 52 Fed. Reg. 22,667 (June 15, 1987). On July 10, 1998, Commerce published the preliminary results of the subject review. See Preliminary Results of 1996-1997 Antidumping Duty Administrative Review and New Shipper Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Preliminary Results"), 63 Fed. Reg. 37,339. Commerce published the Final Results on November 17, 1998. See 63 Fed. Reg. at 63,842.

_____

[2] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## I. Substantial Evidence Test

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB ("Universal Camera"), 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted). Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two

fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it <u>de novo</u>.'" <u>American Spring Wire Corp. v. United States</u> ("<u>American Spring Wire</u>"), 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting <u>Penntech Papers, Inc. v. NLRB</u> ("<u>Penntech Papers</u>"), 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, <u>Universal Camera</u>, 340 U.S. at 488)).

## II. <u>Chevron</u> Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u> ("<u>Chevron</u>"), 467 U.S. 837 (1984). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." <u>Id.</u> at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing <u>Chevron</u>, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the

matter." Id. (citations omitted). Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted); but see Floral Trade Council v. United States, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United

States, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. See Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

## DISCUSSION

**I.  Commerce's Selection of Export Data From Japan to Indonesia as a Surrogate Value for Bearing Quality Steel Bar Used by PRC Producers to Manufacture TRB Cups and Cones**

**A.   Background**

Antidumping margins are the difference between NV and United States price of the merchandise. When the merchandise is produced in a non-market economy country ("NME") such as the PRC, Commerce constructs NV pursuant to section 1677b(c), which provides that

> the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce].

19 U.S.C. § 1677b(c)(1) (1994) (emphasis supplied).

The statute does not define the phrase "best available information," it only provides that

> [Commerce], in valuing factors of production . . . ., shall utilize, to the extent possible, the prices or

costs of factors of production in <u>one or more market economy countries</u> that are[:]

(A) at a level of economic development comparable to that of the nonmarket economy country, and
(B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4) (1994) (emphasis supplied).

Thus, the statute grants to Commerce broad discretion to determine the "best available information" in a reasonable manner on a case-by-case basis. See <u>Lasko Metal Prods., Inc. v. United States</u> ("<u>Lasko</u>"), 43 F.3d 1442, 1446 (Fed. Cir. 1994) (noting that the statute "simply does not say--anywhere--that the factors of production must be ascertained in a single fashion.") Consequently, Commerce values as many factors of production ("FOPs") as possible using information obtained from the "primary" surrogate country, that is, the country that Commerce considers to be most comparable in economic terms to the NME country being investigated, and that also produces merchandise comparable to the subject merchandise. See, e.g., <u>Tianjin Mach. Import & Export Corp. v. United States</u> ("<u>Tianjin</u>"), 16 CIT 931, 940-41, 806 F. Supp. 1008, 1018 (1992); <u>Timken Co. v. United States</u>, 16 CIT 142, 145-46, 788 F. Supp. 1216, 1218 (1992). Additionally, if Commerce determines that suitable values cannot be obtained from the data of the primary surrogate country, Commerce resorts to the data from the second, and sometimes the third, surrogate. See, e.g., <u>Timken Co. v. United States</u> ("<u>Timken 2001</u>"), 25 CIT __, __, 166 F. Supp.

2d 608, 621-23 (2001); <u>Notice of Final Determination of Sales at</u>
<u>Less Than Eair Value: Certain Cased Pencils From the People's</u>
<u>Republic of China</u>, 59 Fed. Reg. 55,625, 55,629 (Nov. 8, 1994);
<u>Final Determination of Sales at Less Than Fair Value: Certain</u>
<u>Helical Spring Lock Washers From the People's Republic of China</u>, 58
Fed. Reg. 48,833, 48,835 (Sept. 20, 1993).

During this review, Commerce initially chose India as the
primary surrogate country to value all FOPs except steel inputs and
scrap, which were valued using the data from the secondary
surrogate country, Indonesia. <u>See</u> <u>Preliminary Results</u>, 63 Fed.
Reg. at 37,342-43. Commerce explained that in order to value the
steel inputs used by PRC producers to manufacture TRB cups and
cones, Commerce "reviewed several data sources, including: U.S.,
Indian, and Indonesian import statistics, and [export data from
Japan] . . . to determine the most accurate value for steel
inputs." <u>Final Results</u>, 63 Fed. Reg. at 63,845. Commerce reasoned
that it decided to use secondary surrogate data (that is,
Indonesian import statistics) over import data from India because
Commerce determined that steel values contained in the Indian
import data were not reliable for two reasons: (1) Commerce was
unable to isolate Indian import value for bearing quality steel
used to manufacture the merchandise at issue, <u>see</u> Def.'s Mem. Opp.
Pl.'s Mot. J. Agency R. ("Def.'s Mem."), App. Ex. 8 at 3; and (2)

"when compared with the U.S. import statistics for the HTS category which only includes bearing quality steel bars and rods, the Indian values are unreliably high." Final Results, 63 Fed. Reg. at 63,845. Commerce, however, re-examined the matter after considering comments that questioned the use of Indonesian import statistics to value bearing quality steel bar used by Chinese manufacturers in the production of cups and cones. See id.

Upon examining the Indonesian import statistics, Commerce found that Indonesian tariff category 7228.30 "include[d] several types of hot-rolled bars and rods of alloy steel, in addition to the bearing quality steel bars and rods used in cup and cone production." Id. at 63,845. Although the Indonesian import statistics were consistent with the United States benchmark, Commerce was persuaded by "Timken's arguments that the volume of steel imported into Indonesia exceeded the volume of bearing quality steel that could actually be consumed in that country." Def.'s Mem. at 14. Commerce, therefore, decided to further examine the Indonesian import values. See Final Results, 63 Fed. Reg. at 63,845.

Examining the data further, Commerce observed that the export data from Japan to Indonesia "provid[ed] a breakdown of the broad six-digit 7228.30 category into several more narrowly defined . . . categories." Id. In particular, during the period of review,

2,974 metric tons ("MTs") of the merchandise were exported to Indonesia under Japanese HS Code 7228.30.900 (that is, a category that most likely includes the bearing quality steel bar used to produce the merchandise at issue). See id. at 63,846. Consequently, Commerce concluded that export data from Japan to Indonesia under category 7228.30.900 would constitute the best information available to value steel used to produce the merchandise at issue. See id. Commerce stated that

> [b]ecause this Japanese tariff category is the narrowest category which could contain bearing quality steel and because it is consistent with [the United States] benchmark, [Commerce] believe[s] it is the best alternative for valuing steel used in the production of cups and cones. Moreover, [Commerce] view[s] the data on [exports from Japan] to Indonesia as an Indonesian value, *i.e.*, it is a value from a country comparable to the PRC. Although the data are from Japanese statistics, [Commerce] ha[s] used those statistics to "refine" the Indonesian data in an attempt to make the import category conform better to the input used by the PRC TRB producers.

Id.

Moreover, Commerce examined and rejected the annual report data of eight Indian bearing manufacturers suggested by Timken as an alternative for valuing the bearing quality steel used in the production of the subject merchandise at issue. See 63 Fed. Reg. at 63,843-44. Commerce found that the annual report data of the eight Indian bearing manufacturers were unsuitable to value the steel inputs because "only three [of these manufacturers] break out

steel costs according to the type of steel used in the production of bearings." Id. at 63,843. Commerce further pointed out that

> [f]or the three companies that do break out their steel costs by broad types of steel, only Asian Bearing separately identifie[d] "steel bars," the steel input used by the Chinese respondents to produce certain TRB components (cups, cones, & rollers). However, because Asian Bearing provides an average cost for steel bar and does not provide specific costs according to the type of bar used (i.e., hot-rolled versus cold-rolled), [Commerce] is unable to accurately value the two types of steel bar used in the production of cups and cones versus that used in the production of rollers. Furthermore, the annual report does not specify whether the steel bar is only used by Asian Bearing in the production of tapered roller bearings or whether it is used to produce other products manufactured by the company. To the extent that Asian Bearing uses hot-rolled and cold-rolled steel bars in different proportions than the PRC TRB producers, Asian Bearing's average cost of steel bars is not an accurate value to apply to the PRC producers' factors.

Id.

Commerce also stated that it was rejecting Asian Bearing's data because of Commerce's "longstanding practice of relying, to the extent possible, on public statistics on surrogate countries to value any factors for which such information is available over company-specific data." Id. at 63,844.

Finally, Commerce in its brief explained the basis for its rejection of the export statistics from Japan to India as an alternative for valuing the bearing quality steel used in the production of the subject merchandise at issue. See Def.'s Mem. at 31-33. Commerce reasoned that:

Because (1) Commerce found that the Indian import data were significantly higher than the U.S. benchmark; and (2) Timken supplied the [export data from Japan] to India in support of its argument that the Indian import data were reasonable, it is apparent that Commerce rejected the [export data from Japan] to India for the same reasons that it rejected the Indian import data (i.e., both sources of data were unreliable when compared to the U.S. benchmark).

Id. at 32.

### B.    Contentions of the Parties

#### 1.    Timken's Contentions

Timken contends that Commerce abused its discretion when it used export data from Japan to Indonesia to value "the hot-rolled steel bar used to produce tapered roller bearing cups and cones over: (1) the annual report data from eight Indian producers; (2) Indian import statistics; or (3) [export statistics from Japan] to India."  Timken's Mem. P. & A. Supp. Mot. J. Agency R. ("Timken's Mem.") at 24.

With regards to the annual report data from eight Indian producers, Timken asserts that the average material costs of the eight Indian producers was a superior surrogate source to value hot-rolled steel bar used to produce TRB cups and cones than Commerce's use of the export data from Japan to Indonesia.[3]  See

---

[3]    Timken notes that Commerce's practice of selecting "best available information" to determine the surrogate value pursuant to

(continued...)

id. at 25-32. In particular, Timken maintains that: (1) "the eight
annual reports for the Indian bearing producers are publicly
available average data from the primary surrogate country," id. at
28; (2) "unlike Japanese export statistics, the average steel costs
contained in the eight annual reports reflect non-export prices,"
id.; (3) "the eight annual reports for the 1996-97 fiscal year are

---

[3](...continued)
19 U.S.C. § 1677b(c)(1)

> "is to select, where possible, publicly
> available information, which is (1) an average
> non-export value; (2) representative of a
> range of prices within the POR if submitted by
> an interested party, or most contemporaneous
> within the POR; (3) product-specific; and (4)
> tax-exclusive. . . . [Commerce] has also
> articulated a preference for a surrogate
> country's domestic prices over import values."

Timken's Mem. at 27 (quoting Ferrovanadium and Nitrided Vanadium
From the Russian Federation: Notice of Final Results of Antidumping
Duty Administrative Review, 62 Fed. Reg. 65,656, 65,661 (Dec. 15,
1997)).

Timken also maintains that based on the aforementioned
practice of selecting the "best available information," Commerce
has previously used the annual reports or actual price lists of
producers in the surrogate country rather than import statistics.
See Timken's Mem. at 27 (citing Coalition for the Preservation of
American Brake Drum and Rotor Aftermarket Mfrs. v. United States,
23 CIT 88, 115-17, 44 F. Supp. 2d 229, 255-57 (1999); Notice of
Final Determination of Sales at Less Than Fair Value: Certain
Preserved Mushrooms from the People's Republic of China, 63 Fed.
Reg. 72,255, 72,263-64 (Dec. 31, 1998); Notice of Final
Determination of Sales at Less Than Fair Value: Circular Welded
Non-Alloy Steel Pipe From Romania, 61 Fed. Reg. 24,274, 24,279 (May
14, 1996); and Notice of Preliminary Determinations of Sales at
Less Than Fair Value and Postponement of Final Determinations:
Brake Drums and Brake Rotors From The People's Republic of China,
61 Fed. Reg. 53,190, 53,195 (Oct. 10, 1996).

representative of a range of material prices contemporaneous with the period of review," id.; (4) unlike "the Japanese export statistics which also cover non-bearing quality steel, seven of the eight annual reports primarily reflect material costs for bearing quality steel in India," id. at 28-29; and (5) "unlike the Japanese export statistics, the material costs included in the annual reports also reflect domestic prices." Id. at 29. Moreover, Timken points out that Commerce departed from its own "strong preference [to] calculate[] normal value in NME cases based on factor values from a single, primary surrogate source" by rejecting the annual report data from eight Indian producers. Timken's Mem. at 26-27 (citing Peer Bearing Co. v. United States ("Peer Bearing 1998"), 22 CIT 472, 481, 12 F. Supp. 2d 445, 455 (1998); Tianjin, 16 CIT at 940, 806 F. Supp. at 1017-18; Industrial Nitrocellulose From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 62 Fed. Reg. 65,667, 65,668 (Dec. 15, 1997); Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From Ukraine, 62 Fed. Reg. 61,754, 61,762 (Nov. 19, 1997); and Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China, 57 Fed. Reg. 21,058, 21,062 (May 18, 1992)).

Additionally, Timken argues that Commerce "failed to compare the merits of [Indian annual report data] with . . . export statistics [from Japan] to Indonesia." Timken's Mem. at 30; see also Timken's Reply Br. ("Timken's Reply") at 4-5. In particular, Timken asserts that: (1) the export data from Japan to Indonesia does not "separately identify material costs for hot-rolled bar for the production of cups and cones," Timken's Mem. at 30; (2) the export data from Japan to Indonesia "include[s] non-bearing quality steel," id., and; (3) "Japanese exports of steel to Indonesia were not likely to have been used for the production [of the] subject merchandise." Id. Timken also asserts that the annual reports of the eight Indian producers were publicly available and were used by Commerce to value overhead, SG&A and profit. Timken's Mem. at 31. Finally, Timken maintains that the "fact that the average material[] costs" of the eight Indian producers were on average "higher than Japanese export prices to Indonesia . . . is insufficient to support use of . . . [Japanese exports to Indonesia] as the 'best available information' to value material costs [at issue]." Id. at 32. Timken, therefore, argues that Commerce's decision to use export data from Japan to Indonesia to value the subject merchandise at issue is arbitrary and unsupported by substantial evidence. See Timken's Reply at 5.

As an alternative to the prior argument, Timken suggests that Commerce should have used Indian import statistics to value the steel inputs at issue.[4] <u>Id</u>. In particular, Timken argues that: (1) Commerce's use of United States import data as a benchmark for assessing the reliability of the Indian import data was unreliable and unreasonable, <u>see</u> Timken's Reply at 6-7; Timken's Mem. at 24 n.3; (2) "import[] statistics from the primary surrogate country are superior to . . . export statistics [from Japan] to the secondary surrogate," Timken's Mem. at 24-25 n.3; and (3) Commerce arbitrarily selected export statistics from Japan to Indonesia as a surrogate to value the subject merchandise at issue despite the fact that Indonesia is not a "'significant' bearing producer" and "Indian import statistics were remarkably consistent with the raw material costs reported in the annual reports of eight Indian bearing[] producers." <u>Id.</u> at 25 n.3; <u>see also</u>, Timken's Reply at 7.

---

[4] In its brief, Timken directs the Court to review the arguments Timken made regarding the use of Indian import statistics as a surrogate value in <u>Peer Bearing Co. v. United States</u> ("<u>Peer Bearing 2001</u>"), 25 CIT __, 182 F. Supp. 2d 1285 (2001); <u>Timken 2001</u>, 25 CIT __, 166 F. Supp. 2d 608; <u>Timken Co. v. United States</u> ("<u>Timken 1999</u>"), 23 CIT 509, 59 F. Supp. 2d 1371 (1999); <u>Peer Bearing 1998</u>, 22 CIT at 479-82, 12 F. Supp. 2d at 453-56. <u>See</u> Timken's Mem. at 24. The Court, however, does not entertain arguments "incorporated by reference," that is, those arguments in Timken's prior briefs, and shall only address the arguments currently before the Court.

Finally, Timken alternatively argues that Commerce failed to explain Commerce's rejection of export data from Japan to India as a surrogate value.  See Timken's Mem. at 32-35; Timken's Reply at 8-9.  Timken asserts that "[w]ithout an articulation of reasons as to why [Commerce] considered . . . export statistics [from Japan] to India inadequate, the Court cannot determine whether [Commerce's] decision was arbitrary, capricious, or otherwise not in accordance with law."[5]  Timken's Mem. at 35 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).  Moreover, Timken contends that Commerce should have used the export data from Japan to India over export data from Japan to Indonesia as a surrogate to value the subject merchandise at issue because (1) if Commerce was persuaded by the fact that the export statistics from Japan to Indonesia provide more product-specific data for bearing quality steel bar to value TRB cups and cones, then the very same fact with regards to export statistics for Japanese exports to India should be equally considered by Commerce, see Timken's Mem. at 33; (2) "Japanese steel exported to Indonesia was less likely to be used in the production of identical or comparable merchandise than Japanese

---

[5]  Timken also argues that Commerce's failure to consider export data from Japan to India as a surrogate to value the subject merchandise and Commerce's post-hoc explanation that Commerce "rejected the . . . export statistics [from Japan] to India because they were higher than the U.S. import values . . . requires a remand so that [Commerce] may explain its decision on the record." Timken's Reply at 8; see also id. at 9.

exports to India," id. at 34; (3) Commerce's reliance on United States import data as a benchmark was unreasonable, see id.; and (4) "[i]f Japanese export statistics under HTS 7228.30.90 contained more product-specific information than Indian or Indonesian import statistics, then [Commerce] should have used . . . export statistics [from Japan] to India." Id.

### 2. Commerce's Contentions

Commerce responds that its decision to value steel inputs used by PRC producers to manufacture TRB cups and cones by using export data from Japan to Indonesia rather than either the annual report data for eight Indian producers, or export statistics from Japan to India, or Indian import statistics was reasonable and in accord with the mandate of 19 U.S.C. § 1677b(c). See Def.'s Mem. at 23-33. Specifically, Commerce points out that, contrary to Timken's argument, "'[t]he court's role is not to determine whether the information chosen by Commerce is the "best" actually available, but whether the choice is supported by substantial evidence and is in accordance with law.'" Id. at 25 (quoting Novachem, Inc. v. United States, 16 CIT 782, 786, 797 F. Supp. 1033, 1037 (1992)). Commerce, therefore, maintains that its selection of the export data from Japan to Indonesia as the "best available" surrogate value should be sustained because that data "represented 'the narrowest category most likely containing bearing quality steel

bar'; and . . . 'it is consistent with [the United States] benchmark.'" Def.'s Mem. at 25 (quoting Final Results, 63 Fed. Reg. at 63,846).

Commerce argues that its decision to reject the annual report data of eight Indian bearing manufacturers as an alternative for valuing the bearing quality steel used in the production of the subject merchandise at issue was supported by substantial evidence. See Def.'s Mem. at 26-29. Commerce asserts that it examined the annual report data of the eight Indian producers and found that only three of the eight reports "identified steel costs by the type of steel used in the production of bearings." Id. at 27. Moreover, Commerce points out that

> "[f]or the three companies that do break out their steel costs by broad types of steel, only Asian Bearing separately identifie[d] 'steel bars,' the steel input used by the Chinese respondents to produce certain TRB components (cups, cones, & rollers)."

Id. (quoting Final Results, 63 Fed. Reg. at 63,843).

Commerce further reasoned that it rejected the Asian Bearing annual report for three reasons:

> (1) "Asian Bearing provides an average cost for steel bar and does not provide specific costs according to the type of bar used (i.e., hot-rolled versus cold-rolled)"; (2) "the annual report does not specify whether the steel bar is only used by Asian Bearing in the production of tapered roller bearings or whether it is used to produce other products manufactured by the company"; and (3) "public statistics provide a more representative value

for these material inputs than a single company's information."

Def.'s Mem. at 27 (quoting <u>Final Results</u>, 63 Fed. Reg. at 63,843-44).

Additionally, Commerce maintains that "[n]either the Indian annual reports nor the Japanese export data . . . satisfied all of Commerce's preferences." Def.'s Mem. at 29. Commerce, therefore, selected the "policy preference (<u>i.e.</u>, non-export value or product-specificity) [that] would lead to a more accurate dumping margin." <u>Id.</u>

Commerce also argues that its decision to reject Indian import statistics as an alternative for valuing the bearing quality steel used in the production of the subject merchandise at issue was supported by substantial evidence. <u>Id.</u> at 29-31. Commerce points out that

> "[i]n comparing [Indian import statistics] data to other market values, including U.S. imports from category 7228.30.20 (the only import category on the record which explicitly contains only bearing quality steel), [Commerce] found the Indian values to be unreliable because the values for these imports were significantly higher."

<u>Id.</u> at 30 (quoting App. Ex. 8).

Additionally, Commerce was unable to isolate Indian import value for bearing quality steel used to manufacture the subject merchandise at issue. <u>See</u> Def.'s Mem., App. Ex. 8 at 3. Commerce

also points out that the United States benchmark used by Commerce in assessing the reliability of the Indian import data was reasonable and reliable. See Def.'s Mem. at 31; see also Final Results, 63 Fed. Reg. at 63,844-45.

Finally, Commerce contends that its decision to reject export data from Japan to India as an alternative for valuing the bearing quality steel used in the production of the subject merchandise at issue was supported by substantial evidence. See Def.'s Mem. at 31-33. Commerce agrees with Timken that Commerce "did not formally explain the basis for its rejection of . . . export statistics [from Japan] to India as a surrogate value." Id. at 31. Nevertheless, Commerce maintains that the Court may discern Commerce's rejection of export data from Japan to India as a surrogate value because Commerce's reasoning "is apparent from the administrative record." Id. In particular, Commerce reasoned that

> [b]ecause [:] (1) Commerce found that the Indian import data were significantly higher than the U.S. benchmark; and (2) Timken supplied the . . . export data [from Japan] to India in support of its argument that the Indian import data were reasonable, it is apparent that Commerce rejected the . . . export data [from Japan] to India for the same reasons that it rejected the Indian import data (i.e., both sources of data were unreliable when compared to the U.S. benchmark).

Id. at 32.

C.   Analysis

   1.   Commerce's Changes of Policy or Methodology

Agency statements provide guidance to regulated industries. While "'an agency does not act rationally when it chooses and implements one policy and decides to consider the merits of a potentially inconsistent policy in the very near future,'" Transcom, Inc. v. United States, 24 CIT ___, ___, 123 F. Supp. 2d 1372, 1381 (2000) (quoting ITT World Communications, Inc. v. FCC, 725 F.2d 732, 754 (D.C. Cir. 1984)), Commerce, in view of the rapidly-changing world of global trade and Commerce's limited resources, should be able to rely on its "unique expertise and policy-making prerogatives." Southern Cal. Edison Co. v. United States, 226 F.3d 1349, 1357 (Fed. Cir. 2000). "'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy . . . .'" Chevron, 467 U.S. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

An agency decision involving the meaning or reach of a statute that reconciles conflicting policies "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [and a reviewing court] should not disturb [the agency decision] unless it appears from the statute or its legislative history that the  accommodation is not one that

Congress would have sanctioned.'" <u>Chevron</u>, 467 U.S. at 845 (quoting <u>United States v. Shimer</u>, 367 U.S. 374, 382-83 (1961)). Furthermore, an agency must be allowed to assess the wisdom of its policy on a continuing basis. Under the <u>Chevron</u> regime, agency discretion to reconsider policies is inalienable. <u>See</u> <u>Chevron</u>, 467 U.S. at 843. Any assumption that Congress intended to freeze an administrative interpretation of a statute would be entirely contrary to the concept of <u>Chevron</u> which assumes and approves the ability of administrative agencies to change their interpretations. <u>See, e.g.,</u> <u>Maier, P.E. v. United States EPA</u>, 114 F.3d 1032, 1043 (10th Cir. 1997), <u>J.L. v. Social Sec. Admin</u>., 971 F.2d 260, 265 (9th Cir. 1992), <u>Saco Defense Sys. Div., Maremont Corp. v. Weinberger</u>, 606 F. Supp. 446, 450-51 (D. Me. 1985). In sum, underlying agency interpretative policies "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." <u>Chevron</u>, 467 U.S. at 844.

Moreover, "'[a]n [agency] announcement stating a change in the method . . . is not a general statement of policy.'" <u>American Trucking Ass'ns, Inc. v. ICC</u>, 659 F.2d 452, 464 n.49 (5th Cir. 1981) (quoting <u>Brown Express, Inc. v. United States</u>, 607 F.2d 695, 701 (5th Cir. 1979) (internal quotations omitted)). While a policy "denotes . . . [the] general purpose . . . [of the statute] considered as directed to the welfare or prosperity of the state,"

BLACK'S LAW DICTIONARY 1157 (6th ed. 1990), methodology refers only to the "performing [of] several operations[] in the most convenient order," id. at 991; accord Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir. 1983); Interstate Natural Gas Ass'n of Am. v. Federal Energy Regulatory Comm'n, 716 F.2d 1 (D.C. Cir. 1983); Hooker Chems. & Plastics Corp. v. Train, 537 F.2d 620 (2d Cir. 1976). Consequently, the courts are even less in the position to question an agency action if the action at issue is a choice of methodology, rather than policy. See, e.g., Maier, P.E., 114 F.3d at 1043 (citing Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1221 (D.C. Cir. 1983)). Similarly, an agency decision to change its methodology, that is, to take an act of statutory implementation while pursuing the same policy, should be examined under the Chevron test and sustained if the new methodology is reasonable. See, e.g., Koyo Seiko Co., v. United States, 24 CIT ___, ___, 110 F. Supp. 2d 934, 942 (2000) (stating that "'the use of different methods [of] calculati[on] . . . does not [mean there is a] conflict with the statute,'") (quoting Torrington Co. v. United States, 44 F.3d 1572, 1578 (Fed. Cir. 1995)).

Therefore, Commerce's decision to reject the annual report data of eight Indian producers and Commerce's consequential use of alternative data as a surrogate value for bearing quality steel bar

used by PRC producers to manufacture TRB cups and cones was a justifiable change of methodology as long as such change in position was reasonably supported by the record.

### 2.    Commerce's Decision to Use Export Data from Japan to Indonesia

As a preliminary matter, the Court rejects Timken's assertion that Commerce erred in using United States data as benchmarks to test the reliability of the Indian import data and export data from Japan to India.  A comparison of surrogate data to that of market economy in order to determine the reliability of such surrogate data is within "'Commerce's statutory authority and consistent with past practice.'"  Peer Bearing 1998, 22 CIT at 481, 12 F. Supp. 2d at 455 (quoting Writing Instrument Mfrs. Ass'n v. United States ("Writing Instrument"), 21 CIT 1185, 1195, 984 F. Supp. 629, 639 (1997)) (upholding use of United States benchmark as a point of comparison for two possible surrogate values and quoting, in turn, Olympia Indus., Inc. v. United States ("Olympia 1997"), 21 CIT 364, 369 (1997) (approving Commerce's use of data from other market economies to test the reliability of surrogate country data)).  Commerce, therefore, acted within its statutory authority by utilizing United States data to aid in its FOPs valuation.  See 19 U.S.C. §§ 1677b(c)(1) and (4); Peer Bearing 1998, 22 CIT at 481, 12 F. Supp. 2d at 455.

Next, with respect to Timken's challenge to Commerce's decision to use export data from Japan to Indonesia to value the hot-rolled steel bar used by PRC producers to manufacture TRB cups and cones, the Court finds that Commerce's decision was unreasonable.

In this case, during the review at issue, Commerce examined the Indonesian import statistics and found that: (1) Indonesian import statistics were consistent with the United States benchmark; and (2) "the volume of steel imported into Indonesia exceeded the volume of bearing quality steel that could actually be consumed in that country." Def.'s Mem. at 14. Upon further examination of Indonesian import statistics, Commerce observed that export data from Japan to Indonesia under category 7228.30.900 would constitute the best information available to value steel used to produce the merchandise at issue. Commerce reasoned that because

> this Japanese tariff category is the narrowest category which could contain bearing quality steel and . . . it is consistent with [the United States] benchmark.

Final Results, 63 Fed. Reg. at 63,846.

Commerce went on to state that

> [Commerce] view[s] the data on Japanese exports to Indonesia as an Indonesian value, i.e., it is a value from a country comparable to the PRC. Although the data are from Japanese statistics, [Commerce] ha[s] used those statistics to "refine" the Indonesian data in an attempt to make the import category conform better to the input used by the PRC TRB producers.

Id.

With respect to export statistics from Japan to India, Commerce, however, admittedly failed to explain its rejection of the export statistics from Japan to India as a surrogate value. See Def.'s Mem. at 31. While Commerce maintains that the Court may discern Commerce's reasoning for rejecting the export data from Japan to India from the record, the Court finds that Commerce's reasoning for rejecting the export data from Japan to India as a surrogate value was not sufficiently explained. To the contrary, on the basis of the explanation supplied by Commerce one may conclude that it was illogical for Commerce to utilize export data from Japan to Indonesia in order to "refine" the Indonesian data and then to subsequently reject analogously structured export data from Japan to India.

Accordingly, the Court remands this issue to Commerce with instructions to provide the Court with an explanation as to why export statistics from Japan to India are not the "best available information" for the purpose of choosing a surrogate to value hot-rolled steel bar used to produce TRB cups and cones.

II.  **Commerce's Use of Luoyang Bearing Factory's and China National Machinery Import and Export Corporation's Market Economy Import Data**

A.   **Background**

During the POR, Luoyang Bearing Factory ("Luoyang"), China National Machinery Import and Export Corporation ("CMC"), Zhejiang Changshan Bearing (Group) Co., Ltd. ("ZX"), and Zhejiang Machinery Import and Export Corporation ("Zhejiang") "submitted [to Commerce] market economy input prices for steel they imported, directly or indirectly, and used in the production of" TRBs.  Def.'s Mem., App. Ex. 6 at 1.  In the Preliminary Results, Commerce stated that

> [Luoyang and CMC] . . . purchased steel from market economy suppliers and paid for the steel with market economy currencies.  In these instances [Commerce] valued the steel input using the actual prices reported for imported inputs from a market economy . . . .  Where . . . [ZX and Zhejiang] purchased the steel from a PRC trading company [CMC] and paid for the steel in . . . [non-market economy currency], [Commerce] did not use the market economy price to the trading company and instead used surrogate data [to value the steel input].

63 Fed. Reg. at 37,343 (citing Def.'s Mem., App. Ex. 6).

However, in the Final Results, Commerce partially departed from the conclusion reached in its Preliminary Results and "us[ed] . . . [CMC's] import steel price as surrogate data for those companies that actually used the imported steel [that is, ZX and Zhejiang]."  Final Results, 63 Fed. Reg. at 63,854; accord Def.'s Mem. at 33 n.35.  For the purpose of assessing the alternative surrogate data, Commerce determined the reliability of CMC's import

prices by examining the following: "(1) the value and volume of steel imports, (2) the type and quality of the imported steel, and (3) consumption of imported steel by the NME producer." Final Results, 63 Fed. Reg. at 63,854; see also, Olympia Indus., Inc. v. United States ("Olympia 1999"), 23 CIT 80, 82, 36 F. Supp. 2d 414, 416 (1999). Upon examining these factors, Commerce concluded that:

> [t]he record evidence demonstrates that . . . [CMC] purchased steel from a market-economy country, in a convertible currency. This company used a portion of the steel in its own production of TRBs but also sold a portion of the steel to an unrelated manufacturer. Based on the invoices for the imported steel, and the specifications of the steel sourced by the factories domestically, [Commerce] conclude[d] that the imported steel is of the same grade and has the same range of sizes as steel that the NME manufacturers used to produce the subject merchandise.
>
> Regarding the value of the steel imported by . . . [CMC], [Commerce] found that the price paid by the trading company is within the range of prices created by the actual steel prices paid by PRC producers and [Commerce's] surrogate value. Consequently, the price paid by . . . [CMC] is not aberrational. With respect to volume and consumption of steel by the NME producer, [Commerce] note[s] that the amount of steel imported by the trading company was significant and that the NME producer in question consumed a significant amount of imported steel to produce the subject merchandise.

Final Results, 63 Fed. Reg. at 63,854.

### B. Contentions of the Parties

#### 1. Timken's Contentions

Timken contends that Commerce's decision to value material costs for certain steel inputs by using the prices paid by CMC to

market-economy suppliers was not supported by substantial evidence

and contrary to law.  See Timken's Mem. at 36-38.  In particular,

Timken argues that Commerce's reliance on CMC's import prices as an

alternative surrogate value violates "[t]he plain language of the

statute and regulations [which] require, . . . 'to the extent

possible,' that [Commerce] value factors of production based on

prices or costs 'in' another market economy country at a comparable

level of development."  Id. at 36 (quoting 19 U.S.C. § 1677b(c)(4)

and 19 C.F.R. § 353.52(c)(1997));  see also Timken's Reply at 9.

Relying on Olympia 1999, 23 CIT 80, 36 F. Supp. 2d 414, Timken

maintains that "trading company import prices are not actual prices

but surrogate values subject to the requirements of 19 U.S.C. §

1677b(c)(4)."[6]  Timken's Reply at 10;  see also Timken's Mem. at 37.

---

[6]   Timken, in its Reply Brief states that:

Although the Court in Olympia [1999] did address the use
of trading company import prices, the Court reviewed
[Commerce's] reliance on traditional surrogate values
over trading company prices in that case.  Therefore, the
Court in Olympia [1999] did not reach the issue of
whether § 1677b(c)(4) requires [Commerce] to value
factors of production 'to the extent possible' based on
values in one or more market economy countries that are
at a level of economic development comparable to that of
the nonmarket economy country, and significant producers
of the subject merchandise before resort to 'alternative
surrogate' trading company import prices.

Timken's Reply at 13.

    Moreover, contrary to Commerce's argument that the Court of
Appeals for the Federal Circuit ("CAFC") in Lasko, 43 F.3d 1442,

(continued...)

Based on the foregoing, Timken further maintains that "[n]owhere in its final determination does [Commerce] explain that it was not 'possible' to use Indian or other surrogate values according to the expressed statutory requirements."[7]  Timken's Mem. at 38; see Timken's Reply at 13.  Timken, therefore, asserts that a remand is necessary so that Commerce can explain its interpretation of 19 U.S.C. § 1677b(c)(4) as it "applie[s] to the facts of this case." Timken's Reply at 13.

Additionally, Timken argues that Commerce's three-pronged test only examines whether trading company import prices are aberrational or insignificant and does not "determine whether [trading company import] prices reflect market forces and are more

---

[6](...continued)
supports Commerce's treatment of trading company import prices, Timken argues that Lasko "addressed the issue of whether or not [Commerce] could mix-and-match surrogate market values and market-based values to value factors of production."  Timken's Reply at 10.  Timken, therefore, maintains that Lasko did not address "the issue of the proper interpretation of 19 U.S.C. § 1677b(c)(4) or the use of Chinese trading company purchases as surrogates."  Id. Additionally, contrary to Commerce's contention that "Lasko rejected the argument that [§ 1677b(c)(4)] set forth a hierarchy requiring [Commerce] to base foreign market value solely on surrogate factors of production[,]" Timken argues that "Lasko did not involve the selection between competing surrogate values pursuant to § 1677b(c)(4)."  Id. at 12-13.

[7]  For instance, Timken asserts that Commerce could have used the eight annual reports of Indian bearing producers as a possible surrogate to value the steel inputs at issue. See Timken's Mem. at 38.

reliable than surrogate values from a comparable market economy." Timken's Mem. at 42-43; Timken's Reply at 15-16. Timken contends that in order for Commerce to assess the reliability of trading company import prices pursuant to § 1677b(c)(1), Commerce should have considered: (1) "whether the trading company importer sufficiently covered its costs in reselling the imported materials;" (2) "any countertrade arrangements between the trading company and its market-economy supplier;" (3) "any commissions or other consideration paid by the purchaser or supplier to the trading company, or lack thereof;" and (4) "any affiliation between the trading company, the market-economy supplier and/or the Chinese manufacturer." Timken's Mem. at 43. Moreover, Timken maintains that contrary to Commerce's assertion that Olympia 1999, 23 CIT 80, 36 F. Supp. 2d 414, approved Commerce's three-pronged test, "[t]he issue [in Olympia 1999] was not whether [Commerce] could rely on the test to support acceptance of trading company import prices." Timken's Reply at 16.

Next, Timken argues that Commerce's determination that a PRC bearing producer's (that is, Luoyang's) import prices constituted the "best available information" under § 1677b(c)(1) to value material costs for certain steel inputs was contrary to § 1677b(c)(1) and unsupported by substantial evidence because Commerce failed to determine whether the prices paid by the PRC

bearing producer to the market-economy suppliers were "market-driven."   See Timken's Mem. at 39-41.   In particular, Timken maintains that "[i]mports from a market-economy country are not necessarily priced at market-economy rates when sold in a non-market economy country."  Timken's Mem. at 40.  Timken states:

> [i]ndeed, with the increasing number of countries applying antidumping rules, it can be expected that exports to China could be dumped with impunity or sold at price levels that are atypical of prices in the country of exportation. . . .   Producers in highly-developed countries, concerned with unused capacity might export to China at below-market prices in order to better spread their fixed costs.  Or, the domestic Chinese competition may require potential exporters to price at levels not found 'in' their own market economies in order to establish channels of distribution and market share.  In either case, dumped import prices would not reflect prices in the exporting country, whether or not it was at a comparable level of development.

Id.[8]

Moreover, relying on Final Determinations of Sales at Less Than Fair Value: Oscillating Fans and Ceiling Fans From the

---

[8]   In support of its assertions, Timken aruges that "legislative history is instructive" and provides

> [i]n valuing . . . factors {of production}, Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices. However, the conferees  [do] not intend for Commerce to conduct a formal investigation to ensure such prices are not dumped or subsidized, but rather intend that Commerce base its decision on information generally available to it at that time.

Timken's Mem. at 40 (quoting 1988 U.S.C.C.A.N. 1547, 1623).

People's Republic of China ("Oscillating Fans"), 56 Fed. Reg.
55,271, 55,275 (Oct. 25, 1991), Timken maintains that "as
[Commerce] evaluates market-economy prices to determine whether
they are reliable in a market-economy case, [Commerce] should
evaluate those prices to determine whether they are reliable in
[an] NME case."[9]  Timken's Mem. at 41.

Timken also contends that Commerce "should have considered the
volume and frequency of" Luoyang's market-economy purchases[10] and
"should have rejected all prices that were not at arm's length,
that did not reflect commercial quantities, or that otherwise did
not reasonably reflect the actual cost of production in a

---

[9]  Timken contends that contrary to Commerce's argument that
Lasko Metal Prods., Inc. v. United States ("Lasko Metal"), 16 CIT
1079, 1081, 810 F. Supp. 314, 317 (1992), aff'd, Lasko, 43 F.3d
1442, allows Commerce to "presume that the prices paid by PRC
producers are 'market driven' and otherwise reliable[,] . . . this
Court did not address the issue presented in this case of whether
[Commerce] had an obligation to determine whether the prices were,
in fact, 'market driven' or otherwise reliable as required in an
non-NME case pursuant to 19 U.S.C. §§ 1677b(a), (b)."  Timken's
Reply at 14-15.

[10]  Timken refers to 19 C.F.R. § 351.408(c)(1)(1998) and the
comments of this regulation to support its argument that Commerce
"has recognized that use of prices paid by an NME producer to a
market-economy supplier must be assessed for reliability."
Timken's Mem. at 41 n.6.  As Timken and Commerce correctly note, 19
C.F.R. § 351.408(c )(1) does not apply to the subject review.  See
id.; Def.'s Mem. at 35 n.36.  Nevertheless, "[f]or segments of
proceedings initiated on the basis of petitions filed or requests
made after January 1, 1995, but before part 351 applies, part 351
. . . serve[s] as a restatement of [Commerce's] interpretation of
the requirements of the Act as amended by the URAA."  19 C.F.R. §
351.701 (1998).

comparable market economy." Id. at 41-42; see Timken's Reply at 15.


### 2. Commerce's Contentions

Commerce responds that its determination to value material costs for steel inputs using the prices paid by: (1) a PRC bearing producer (Luoyang) and (2) a PRC trading company (CMC) to market-economy suppliers was supported by substantial evidence and in accordance with law. See Def.'s Mem. at 33-39.

First, with respect to Commerce's decision to value material costs for certain steel inputs by using the prices paid by a PRC trading company to market-economy suppliers, Commerce, relying on Lasko argues that the Court "reject[ed] [the] argument that [§ 1677b(c)(4)] set forth a hierarchy that requires Commerce to 'determine [NV] in a[n] NME solely on the basis of surrogate factors of production.'" Def.'s Mem. at 35 (quoting Lasko, 43 F. 3d at 1445). Commerce further argues that since § 1677b(c)(4)

> does not distinguish between producers and trading companies for purposes of determining NV in a case involving an NME country, it is apparent that Commerce's authority to use the actual market-economy prices paid for by producers also extends to actual market-economy prices paid for by trading companies.

Def.'s Mem. at 35.

Moreover, Commerce contends that its three-pronged test is presumptively correct and has been approved by Olympia Indus. Inc.

v. United States, 36 F.3d 414 (CIT 1999) [sic].[11]   Id. at 38.
Commerce further maintains that § 1677b(c)(1) is silent as to the
methodology Commerce is to use in "determin[ing] whether to use the
market prices paid by trading companies as an alternative surrogate
value."  Def.'s Mem. at 38-39.  Commerce, therefore, argues that
since the statute is silent "'the Supreme Court . . . ha[s] held
that our duty is not to weigh the wisdom of, or to resolve any
struggle between, competing views of the public interest, but
rather to respect legitimate policy choices made by the agency
interpreting and applying the statute.'"  Id. at 39 (quoting Lasko,
43 F.3d at 1446 and Suramerica de Aleaciones Laminadas, C.A. v.
United States ("Suramerica"), 966 F.2d 660, 665 (Fed. Cir. 1992),
and citing Timken 1999, 23 CIT at 516, 59 F. Supp. 2d at 1377)).

Second, with respect to Commerce's determination to value
material costs for certain steel inputs by using the prices paid by
a PRC bearing producer to market-economy suppliers, Commerce argues
that this practice was sustained by the CAFC in Lasko.  See Def.'s
Mem. at 33.  In particular, Commerce points out that § 1677b(c)(1)
"requires Commerce to value factors of production using the 'best
available information'" and that Lasko found that "'the best
available information on what the supplies used by the Chinese

---

[11]   The Court assumes that the correct citation is Olympia
1999, 23 CIT 80, 36 F. Supp. 2d 414.

manufactures would cost in a market economy country was the price charged by those supplies on the international market.'" Id. at 33-34 (quoting Lasko, 43 F.3d at 1446). Commerce also points out that contrary to Timken's argument, the prices paid by the PRC bearing producer constituted the best available information because the PRC bearing producer had a contract priced in United States dollars between itself and a market-economy supplier and "'[t]he cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy country.'" Def.'s Mem. at 35-36 (quoting Lasko Metal, 16 CIT at 1081, 810 F. Supp. at 317).

Additionally, Commerce asserts that since Timken's argument (that is, the prices paid by the PRC bearing producer, Luoyang, might not reflect market-economy prices) is based on hypothetical assertions, Commerce's decision to accept the PRC producer's prices are not in conflict with legislative history. See Def.'s Mem. at 36 (citing to 1988 U.S.C.C.A.N. 1547, 1623-24). Commerce also asserts that Timken's argument (that is, Commerce should have considered the volume and frequency of Luoyang's market-economy purchases) is unpersuasive because "[t]he authorities relied upon by Timken reveal that it is [Commerce's] practice to consider the volume of market-economy purchases for purposes of determining

whether to value domestically-purchased inputs based upon the value of imports from a market-economy country." Id. at 37 (citing Final Results of Antidumping Duty Administrative Review of Certain Helical Spring Lock Washers From the People's Republic of China ("Certain Helical Spring Lock Washers"), 62 Fed. Reg. 61,794, 61,796 (Nov. 19, 1997). Commerce, therefore, points out that "[w]here Commerce uses the prices of a respondent's market-economy purchases to value those purchases, it does not consider the volume or frequency of those purchases." Id. at 38 (citing Lasko, 43 F.3d at 1446).

### C.   Analysis

The applicable statute provides that, when dealing with imports from an NME country such as the PRC, Commerce shall determine the NV of the subject merchandise based on FOPs utilized in producing the merchandise. See 19 U.S.C. § 1677b(c)(1). The statute further provides that Commerce shall value the reported FOPs based on the best available information regarding the values of FOPs in an appropriate market economy. See id. While conducting NME investigations, Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries that are[:] (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." See 19

U.S.C. § 1677b(c)(4).

The CAFC, however, reasoned that "the purpose of the statutory provisions [that is, §§ 1677b(c)(1) and (4)] is to determine antidumping margins 'as accurately as possible.'" Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States ("Shakeproof"), 268 F.3d 1376, 1382 (Fed. Cir. 2001) (quoting Lasko, 43 F.3d at 1446); see also Olympia Indus., Inc. v. United States ("Olympia 1998"), 22 CIT 387, 390, 7 F. Supp. 2d 997, 1000-01 (1998) (noting that "accuracy is the touchstone of the antidumping statute" and citing Rhone Poulenc, Inc. v United States ("Rhone Poulenc"), 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Additionally, Commerce's "task in [an NME] investigation is to calculate what . . . [the] costs or prices would be [in the NME] if such prices or costs were determined by market forces." Tianjin, 16 CIT at 940, 806 F. Supp. at 1018.

### 1. Commerce's Decision to Value Material Costs for Certain Steel Inputs by Using the Prices Paid by a PRC Trading Company

The Court disagrees with Timken that Commerce is required to value FOPs pursuant to § 1677b(c )(4) prior to resorting to a PRC trading company's import prices paid to a market-economy supplier to value material costs for certain steel inputs. Specifically, the Court disagrees with Timken's narrow reading of Lasko, 43 F.3d

1442.  The Court in Lasko Metal, 16 CIT at 1081, 810 F. Supp. at

317, reasoned that "[t]he cost for raw materials from a market

economy supplier, paid in convertible currencies, provides Commerce

with the closest approximation of the cost of producing the goods

in a market economy country."  Additionally, the CAFC observed

> "[w]here we can determine that a [non-market economy]
> producer's input prices are market determined, accuracy,
> fairness, and predictability are enhanced by using those
> prices.  Therefore, using surrogate values when market-
> based values are available would, in fact, be contrary to
> the intent of the law."

Shakeproof, 268 F.3d at 1382 (emphasis in original) (quoting Lasko,

43 F.3d at 1446); accord Oscillating Fans, 56 Fed. Reg. at 55,275;

see also Olympia 1998, 22 CIT at 392, 7 F. Supp. 2d at 1002

(stating that "[t]he same holds true here with respect to the

trading company data").

Moreover, the relevant regulation provides:

> [Commerce] normally will use publicly available
> information to value factors.  However, where a factor is
> purchased from a market economy supplier and paid for in
> a market economy currency, [Commerce] normally will use
> the price paid to the market economy supplier.  In those
> instances where a portion of the factor is purchased from
> a market economy supplier and the remainder from a
> nonmarket economy supplier, [Commerce] normally will
> value the factor using the price paid to the market
> economy supplier.

19 C.F.R. § 351.408(c)(1).

In the case at bar, "[t]he record evidence demonstrates that

the Chinese trading company [that is, CMC,] purchased steel from a

market-economy country, in a convertible currency." Final Results, 63 Fed. Reg. at 63,854.  Moreover, "[t]his company used a portion of the steel in its own production of TRBs but also sold a portion of the steel" to ZX and Zhejiang, the PRC producers that purchased the steel from the trading company and paid for the steel in non-market economy currency.  Id.; see also Preliminary Results, 63 Fed. Reg. at 37,343; see also Def.'s Mem., App. Ex. 6.  Based on the foregoing, the Court finds that Commerce's decision to use the PRC trading company's import steel price as surrogate data for ZX and Zhejiang is reasonable, is in accordance with law and is in accord with the purpose of the statutory provisions to determine antidumping margins as accurately as possible.

Next, observing that § 1677b(c)(1) does not specify what constitutes "best available information," the Court concludes that "'[t]he statute [,therefore, does not] . . . require Commerce to follow any single approach in evaluating data.'"  Timken 1999, 23 CIT at 515, 59 F. Supp. 2d at 1376 (quoting Olympia 1997, 21 CIT at 368, and citing Lasko, 43 F.3d at 1446); see also Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States, 23 CIT 479, 481, 59 F. Supp. 2d 1354, 1357 (1999), aff'd, Shakeproof, 268 F.3d 1376 (stating that "[t]he statute requires Commerce to use the best available information, but does not define that term" and  pointing out that "'[t]he relevant statute does not

clearly delineate how Commerce should determine what constitute the [best available information,]'" (quoting Olympia 1998, 22 CIT at 389, 7 F. Supp. 2d at 1000)).

During the POR, Commerce utilized a three-pronged test in assessing the reliability of the PRC trading company's import prices. See Final Results, 63 Fed. Reg. at 63,854. Specifically, Commerce examined: "(1) the value and volume of steel imports, (2) the type and quality of the imported steel, and (3) consumption of imported steel by the NME producer." Id. Applying the three-pronged test to the case at bar, Commerce stated:

> Based on the invoices for the imported steel, and the specifications of the steel sourced by the factories domestically, [Commerce] conclude[d] that the imported steel is of the same grade and has the same range of sizes as steel that the NME manufacturers used to produce the subject merchandise.
>
> Regarding the value of the steel imported by the trading company, [Commerce] found that the price paid by the trading company is within the range of prices created by the actual steel prices paid by [the] PRC producers and [Commerce's] surrogate value. Consequently, the price paid by the PRC trading company is not aberrational. With respect to volume and consumption of steel by the NME producer, [Commerce] note[s] that the amount of steel imported by the trading company was significant and that the NME producer in question consumed a significant amount of imported steel to produce the subject merchandise.

Id.

While it is possible that Timken's proposed factors could indeed have better assessed the reliability of trading company

import prices, the Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." Suramerica, 966 F.2d at 665. The Court, therefore, affirms Commerce's use of its three-pronged test in assessing the reliability of trading company import prices as reasonable and in accordance with law.

### 2. Commerce's Decision to Value Material Costs for Certain Steel Inputs by Using the Prices Paid by a PRC Bearing Producer

The Court disagrees with Timken's argument that since Commerce did not use the mode of examination offered by Timken on the issue, that is, whether prices paid by a PRC bearing manufacturer, Luoyang, to market-economy suppliers were market driven, Commerce's determination to value certain steel inputs by using the prices paid by Luoyang was contrary to § 1677b(c)(1) and unsupported by substantial evidence.

The Court is not persuaded by Timken's argument that "as [Commerce] evaluates market-economy prices to determine whether they are reliable in a market-economy case, [Commerce] should [use the same mode to] evaluate those prices to determine whether they

are reliable in [an] NME case."[12]  Timken's Mem. at 41.  As <u>Lasko</u>
<u>Metal</u> stated, "[t]he cost for raw materials from a market economy
supplier, paid in convertible currencies, provides Commerce with
the closest approximation of the <u>cost of producing the goods in a</u>
<u>market economy country</u>."    16 CIT at 1081, 810 F. Supp. at 317
(emphasis supplied); <u>see also</u> <u>Shakeproof</u>, 268 F.3d at 1382,

> "[w]here we can determine that a [non-market economy]
> producer's input prices are market determined, accuracy,
> fairness, and predictability are enhanced by using those
> prices.  Therefore, using surrogate values when market-
> based values are available would, in fact, <u>be contrary to</u>
> <u>the intent of the law</u>."

(emphasis in original) (quoting <u>Lasko</u>, 43 F.3d at 1446); accord
<u>Oscillating Fans</u>, 56 Fed. Reg. at 55,275.  Therefore, the cost for
raw materials from a market-economy supplier, paid in convertible
currency, constitutes an alternative market-driven price for the
purpose of valuation.

During the POR, Commerce determined that the import prices
paid in hard currency by Luoyang (that is, a PRC bearing producer)

---

[12]    Market-economy cases and non-market economy cases are
distinct.  <u>See, e.g.,</u> <u>Shakeproof</u>, 268 F.3d at 1379 n.1. ("The [NV]
of goods in 'market economy' cases is generally the price at which
the foreign product is first sold in the exporting country. . . .
[T]he normal value of goods in [NME] may be instead determined by
looking at the 'factors of production' used to manufacture the
goods," citations omitted); <u>see also</u> <u>Lasko</u>, 43 F.3d at 1445 ("[I]f
[Commerce] cannot determine [NV] pursuant to the general provisions
of § 1677b(a), then [Commerce] must use the [FOP] methodology to
<u>estimate</u> [NV] for the merchandise in question") (emphasis in
original).

to a market-economy supplier represented the "best available information" to value material costs for certain steel inputs. Commerce indicates that Luoyang's "November 12, 1997, submission included a contract between Luoyang and a market economy supplier for the purchase of steel used in the production of bearing cages. The contract showed a price in U.S. dollars." Def.'s Mem., App. Ex. 6 at 1; see also Def.'s Proprietary Ex. 1 (providing a copy of the November 12, 1997 contract). Based on the foregoing, the Court finds that Commerce's determination to value certain steel inputs by using the prices paid by Luoyang to market-economy suppliers is reasonable, is in accordance with § 1677b(c)(1) and is supported by substantial evidence. See Peer Bearing 2001, 25 CIT at __, 182 F. Supp. 2d at 1305 ("'[i]n the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable'" (quoting Timken 1999, 23 CIT at 516, 59 F. Supp. 2d at 1377); see also Chevron, 467 U.S. at 844-45.

Similarly, the Court is not persuaded by Timken's argument that Commerce was obligated to examine the volume and frequency of Luoyang's market-economy purchases. As Commerce correctly notes, "[t]he authorities relied upon by Timken reveal [conversely,] that it is [Commerce's] practice to consider the volume of market-economy purchases for purposes of determining whether to value domestically-purchased inputs based upon the value of imports from

a market-economy country." Def.'s Mem. at 37 (citing Certain Hel-

ical Spring Lock Washers, 62 Fed. Reg. at 61,796, and Antidumping

Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (May 19,

1997)).

Accordingly, the Court affirms Commerce's decision to value

material costs for steel inputs by using the prices paid by a PRC

producer and a PRC trading company to market-economy suppliers.

### III. Commerce's Valuation of Scrap Generated From the Production of Cups, Cones and Rollers

#### A.    Background

During the period of review, Commerce

valued scrap recovered from the production of cups and
cones using Indonesian import statistics from HTS
category 7204.2900.  Scrap recovered from the production
of rollers and cages was valued using import data from
the Indian tariff subheading 7204.29 and 7204.4100
respectively.

Preliminary Results, 63 Fed. Reg. at 37,343.

In the Final Results, Commerce did "not adjust[] the values

for scrap from the Preliminary Results, with the exception of the

change . . . relating to roller scrap."  Final Results, 63 Fed.

Reg. at 63,847.  Specifically, Commerce explained that

category 7204.29.09 best captures the type of scrap
generated from the production of rollers and [Commerce]
ha[s] recalculated the surrogate value for this scrap
excluding data from subcategory 7204.29.01.  However,
[Commerce] notes that [Commerce] continue[s] to use the

> broad category 7204.29 to value scrap from the production
> of cups and cones because the Indonesian import data do
> not provide a further breakdown of this category into
> subheadings.  Therefore, for scrap generated from cups
> and cone production, [Commerce] used data under
> Indonesian import category 7204.29, "other waste and
> scrap of alloy steel."

Id. at 63,846.


### B.    Contentions of the Parties

#### 1.    Timken's Contentions

Timken argues that Commerce "erred in selecting scrap values

that reflected the prices of high quality scrap in the face of

record evidence that the scrap of Chinese bearing producers

consisted of low quality turnings, shavings, and low-grade scrap."

Timken's Mem. at 44.  In particular, Timken maintains that "[t]he

surrogate values . . . were significantly higher in value than the

benchmark U.S. imports of high and low quality scrap under HTS No.

7204.29.00, 7204.41.00.20, 7204.41.00.60 or American Metal Market

prices for shop turnings."  Id. (citing Timken's Mem. at 19, Table

2).[13]  Moreover, Timken maintains that Commerce failed to explain

---

[13]  Besides these four benchmarks supplied by Timken to support
its argument that Commerce's surrogate values are higher in value
than Timken's benchmarks, Timken mentions Russian scrap prices as
a fifth possible benchmark.  See Timken's Reply at 17 (citing
Timken's Mem. at 19, Table 2).  Nevertheless, with respect to the
Russian scrap price, Timken maintains "[Commerce] was unlikely to
rely on another NME country's prices."  Timken's Reply at 20
(citing 19 U.S.C. § 1677b(c)(2) and 19 C.F.R. § 353.52(b)(1997)).

why the American Metal Market prices could not serve as an

alternative surrogate to value scrap.  See Timken's Mem. at 46;

Timken's Reply at 20-21.  Timken further maintains that Commerce's

approach was inconsistent because "Indian domestic, import or

export steel values were not 'reliable' by [Commerce's] standard

because they were higher than U.S. import values, yet scrap values

[chosen by Commerce that were] higher than U.S. import values were

[deemed by Commerce] somehow reliable."[14]  Timken's Reply at 17.

_____

[14]     Timken also contends that Commerce departed from its
previous methodology of "valuing scrap using the same surrogate
source as the raw materials."  Timken's Mem. at 46 (citing Final
Results and Partial Termination of Antidumping Duty Administrative
Review of Tapered Roller Bearings and Parts Thereof, Finished and
Unfinished, From the People's Republic of China, 62 Fed. Reg. 6173,
6180 (Feb. 11, 1997), and Final Results of Antidumping Duty
Administrative Review and Revocation in Part of Antidumping Duty
Order of Tapered Roller Bearings and Parts Thereof, Finished and
Unfinished, From the People's Republic of China, 62 Fed. Reg. 6189,
6196 (Feb. 11, 1997)); see also Timken's Reply at 21-22.
Specifically, Timken points out that Commerce, in this review,
"valued raw materials for cups and cones based on Japanese export
statistics but valued scrap from the production of cups and cones
based on Indonesian import statistics."  Timken's Mem. at 46;
accord Timken's Reply at 21-22.

     Commerce asserts that Timken's argument is incorrect because
Commerce does not have a practice of valuing scrap using the same
surrogate source as raw materials.  See Def.'s Mem. at 42-43.  The
Court finds that Commerce is not required to provide an explanation
for not using the same surrogate to value steel and scrap in this
case.  See Allied-Signal Aerospace Co. v. United States, 28 F. 3d
1188, 1191 (Fed. Cir. 1994) ("[i]n view of the discretionary, case-
by-case nature of [Commerce's] BIA [that is, best available
information] determinations, [Commerce] is obligated only to use a
methodology consistent with its statutory authority, and it is not
required to supply a 'reasoned analysis' justifying its
adoption."), cert. denied, 513 U.S. 1077 (1995); see also National

(continued...)

### 2.    Commerce's Contentions

Commerce maintains that its valuation of scrap generated from the production of cups, cones and rollers is supported by substantial evidence and is in accordance with law.  See Def.'s Mem. at 40.

Commerce argues that it "recognized that, notwithstanding the fact that the PRC production process might result in lower quality scrap, 'it remains bearing quality scrap.'"  Id. (quoting Final Results, 63 Fed. Reg. at 63,847).  Additionally, Commerce maintains that "'[s]ince steel used in the production of cups and cones is bearing quality steel, the scrap resulting from the production thereof must be of a corresponding grade.'"  Id.  Commerce further maintains that it acted within its discretion in not adjusting the surrogate values of scrap to account "for the potentially low quality of the PRC scrap."  Def.'s Mem. at 40 (quoting Shieldalloy Metallurgical Corp. v. United States ("Shieldalloy"), 20 CIT 1362, 1368, 947 F. Supp. 525, 532 (1996), pointing out that "'[t]he statute does not specify what constitutes best available information, nor does it prescribe a specific method for adjusting raw material prices to account for differences in grade or

_____

[14](...continued)
Steel Corp. v. United States, 18 CIT 1126, 1130, 870 F. Supp. 1130, 1135 (1994) ("it appears the Federal Circuit has given Commerce broad discretion to change its methodology without explanation").

quality'" and <u>Peer Bearing 1998</u>, 22 CIT at 481, 12 F. Supp. 2d at 455, explaining that "Commerce's authority to select appropriate surrogate values to determine [NV] based on FOP includes the authority to do so without adjustment")).

Furthermore, Commerce, relying on <u>Peer Bearing 1998</u>, 22 CIT at 481, 12 F. Supp. 2d at 455, contends that it acted within its discretion in not using Timken's proffered United States benchmarks to test Commerce's surrogate values of scrap because those proffered United States benchmarks did not contain the bearing quality steel used by PRC bearing producers. <u>See</u> Def.'s Mem. at 40-41. In particular, Commerce points out that

> "[t]he HTS category which Timken uses for its comparison (7204.41.0060 'borings, shovelings, and turnings') does not include scrap generated from bearing quality steel. . . . [Additionally,] [o]f the information contained on the record, only the broad U.S. HTS categories 7204.41 and 7204.49 provide for a break-down of scrap into sub-categories based on the size and quality of scrap. However, these categories do not include bearing quality steel."

<u>Id.</u> (quoting <u>Final Results</u>, 63 Fed. Reg. at 63,847).

Finally, with respect to Timken's argument that Commerce failed to explain why it declined American Metal Market prices as an alternative surrogate to value scrap, Commerce argues that "Timken never presented this argument to Commerce in its case brief, as required by 19 C.F.R. § 353.38(c)(2)." Def.'s Mem. at 41. Commerce alleges that, Timken, therefore, "failed to exhaust

its administrative remedies concerning this issue."[15]   Id. at 42.


   C.   **Analysis**

   As a preliminary matter, the Court addresses Commerce's argument that Timken failed to exhaust its administrative remedies. The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court.   See Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155, (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider

_____

   [15]   In its reply brief, Timken first points out that "in its preliminary determination comments, Timken submitted the American Metal Market prices pointing out that they . . . were representative of world market prices."   Timken's Reply at 18 (citing Timken's Mem. Pub. Doc. 129).   Next, Timken states that

> [i]n its case brief, Timken argued that it was unreasonable to use any surrogate value for undifferentiated scrap imports that did not account for the low quality of PRC scrap.   In doing so, Timken compared the scrap values used in the preliminary determination to the American Metal Market prices, . . . and U.S. import statistics.

Timken's Reply at 18 (citing Timken's Mem. Pub. Doc. 280). Finally, Timken argues that "during the hearing [that is, the September 9, 1998 hearing], counsel for Timken specifically pointed out that evidence from the American Metal Market [prices] for shop turning prices provides [Commerce] with a world market benchmark of $82/MT. . . ."   Timken's Reply at 19 (citing Timken's Mem. Pub. Doc. 294 at 33-35).

the matter, make its ruling, and state the reasons for its action").[16]

_____

   [16] There is however, no absolute requirement of exhaustion in the Court of International Trade in non-classification cases.  See Alhambra Foundry Co. v. United States ("Alhambra"), 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988).  Section 2637(d) of Title 28 directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies.  See Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998).  Therefore, because "each exercise of judicial discretion [does] not requir[e] litigants to exhaust administrative remedies," the court is authorized to determine proper exceptions to the doctrine of exhaustion.  Alhambra, 12 CIT at 347, 685 F. Supp. at 1256 (citing Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986), rev'd in part on other grounds, Koyo Seiko Co. v. United States, 20 F.3d 1156 (Fed. Cir. 1994)).

   In the past, the court has exercised its discretion to obviate exhaustion where: (1) requiring it would be futile, see Rhone Poulenc, S.A. v. United States ("Poulenc"), 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) ("it appears that it would have been futile for plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which plaintiff may be granted at the administrative level," United States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982); (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken, 10 CIT at 93, 630 F. Supp. at 1334; (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency by considering the question, see id.; R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983); and (4) plaintiffs had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent. See Philipp Bros., Inc. v. United States, 10 CIT 76, 80, 630 F. Supp. 1317, 1321 (1986).

The purpose behind the doctrine of exhaustion is to prevent courts from premature involvement in administrative proceedings, and to protect agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, (1967); see also Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21, 29 (D.C. Cir. 1984) (pointing out that the "exhaustion doctrine . . . serv[es] four primary purposes: [(1)] it ensures that persons do not flout [legally] established administrative processes . . .; [(2)] it protects the autonomy of agency decisionmaking; [(3)] it aids judicial review by permitting factual development [of issues relevant to the dispute]; and [(4)] it serves judicial economy by avoiding [repetitious] administrative and judicial factfinding and by" resolving sole claims without judicial intervention).

While a plaintiff cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument, plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it.  See generally, Hormel v. Helvering, 312 U.S. 552 (1941); see also Rhone Poulenc, 899 F.2d at 1191.  The sole fact of an agency's failure to address plaintiff's challenge does not

invoke the exhaustion doctrine and shall not result in forfeiture
of plaintiff's judicial remedies.  See generally, B-West Imports,
Inc. v. United States, 19 CIT 303, 880 F. Supp. 853 (1995).  An
administrative  decision  not  to  address  the  issue  cannot  be
dispositive of the question whether or not the issue was properly
brought to the agency's attention.  See, e.g., Allnutt v. United
States DOJ, 2000 U.S. Dist. LEXIS 4060 (D. Md. 2000).

In the case at bar, Timken sufficiently provided Commerce with
an opportunity to address the issue of American Metal Market prices
as  a  surrogate  to  value  scrap  when  Timken:  (1)  "submitted  the
American Metal Market prices pointing out that they . . . were
representative  of  world  market  prices,"  Timken's  Reply  at  18
(citing Timken's Mem. Pub. Doc. 129); (2) compared in its case
brief  to  Commerce  "the  scrap  values  used  [by  Commerce]  in  the
preliminary determination to the American Metal Market prices, . .
.  and  U.S.  import  statistics,"  Timken's  Reply  at  18  (citing
Timken's Mem. Pub. Doc. 280); and (3) during the September 9, 1998
hearing with Commerce, "pointed out that evidence from the American
Metal Market [prices] for shop turning prices provides [Commerce]
with a world market benchmark of $82/MT. . . ."  Timken's Reply at
19  (citing  Timken's  Mem.  Pub.  Doc.  294  at  33-35).   Moreover,
Commerce concedes that

> Timken argue[d] that the values used by [Commerce] for
> scrap  in  the  Preliminary  Results  are  too  high  when

compared with world market prices for scrap. . . .
Timken state[d] that the scrap values selected by
[Commerce] reflect prices of high-quality scrap, not the
residue from bearing production. <u>Timken supports its
argument by noting that scrap prices reported in the
American Metal Market for 'shop turnings,' a low quality
scrap, averaged only $82 per MT delivered, whereas the
value [Commerce] selected cup and cone scrap was $150 per
MT</u>.

63 Fed. Reg. at 63,846 (emphasis supplied).

The Court, therefore, concludes that Timken properly exhausted

its administrative remedies and has the right to raise this issue

to the Court.

The Court holds that Commerce's authority to select appropri-

ate surrogate data includes the authority to base a calculation on

these data without adjustment, if such method is reasonable. <u>See</u>

<u>Peer Bearing 2001</u>, 25 CIT at __, 182 F. Supp. 2d at 1305; <u>Timken</u>

<u>2001</u>, 25 CIT at __, 166 F. Supp. 2d at 625; <u>Peer Bearing 1998</u>, 22

CIT at 481-82, 12 F. Supp. 2d at 456; <u>Timken 1999</u>, 23 CIT at 516,

59 F. Supp. 2d at 1377; <u>see also</u> <u>Chevron</u>, 467 U.S. at 844-45;

<u>Shieldalloy</u>, 20 CIT at 1368, 947 F. Supp. at 532 ("The statute

[that is, 19 U.S.C. § 1677b(c)] does not specify what constitutes

best available information, nor does it prescribe a specific method

for adjusting raw material prices to account for differences in

grade or quality"). Nevertheless, Commerce's authority to select

unadjusted data does not dispose of Commerce's obligation to

address each comment properly brought before Commerce on the

merits. Commerce's failure to address the merits of American Metal Market prices prevents the Court from reviewing the issue intelligibly. Therefore, the Court remands this issue to Commerce with instructions to explain whether or not the American Metal Market prices can serve as an alternative surrogate to value scrap and, if Commerce concludes that the American Metal prices present the "best available information" for the purpose of such surrogate evaluation, to recalculate Commerce's determination accordingly.[17]

## IV. Commerce's Reliance on Six Indian Producers' Reported Data in Commerce's Determination of Overhead, Selling, General and Administrative Expenses and Profit Rate

### A. Background

While Commerce prefers to base FOPs information on industry-wide public information, Commerce found that information regarding

---

[17] The Court notes that the other four benchmarks proffered by Timken are not at issue because Timken conceded that

[(1)] the first benchmark [that is, United States import statistics, HTS No. 7204.29.00] valued at $128/MT consisted of high quality waste which was not comparable to the low-quality waste generated by PRC producers; [(2)] [t]he second [that is, United States import statistics, HTS No. 7204.41.00.20] and third [that is, United States import statistics HTS No. 7204.41.0060] benchmarks, as [Commerce] noted, of $126 and $104 [per MT respectively], were for non-bearing quality steel scrap from the production of cages; . . . [(3)] the only logical surrogate value for low quality scrap based on the concerns articulated for the first time in its final determination was the American Metal Market prices.

Timken's Reply at 20-21 (citing Timken's Mem. Table 2 at 19).

overhead and SG&A rates for producers of subject merchandise during the period of review was not available. See Final Results, 63 Fed. Reg. at 63,850.

Section 1677b(c)(1) of Title 19 requires Commerce to "determine the [NV] of the subject merchandise on the basis of the value of the [FOPs] utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." General expenses are the expenses that do not bear a direct relationship to the production of the merchandise at issue, such as SG&A expenses. The subsection also states that the valuation of FOPs "shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." Id. Section 1677b(c)(4) provides that, in valuing FOPs under paragraph (1) of § 1677b(c), Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries. . . ."

In the Preliminary Results, Commerce used "information obtained from the fiscal year 1996-97 annual reports of eight Indian bearing producers" as surrogate values for factory overhead, SG&A and profit. 63 Fed. Reg. at 37,343; see Def.'s Mem., App. Ex. 7, 9.

Specifically, Commerce

> calculated factory overhead and SG&A expenses (exclusive
> of labor and electricity) as percentages of direct inputs
> (also exclusive of labor) and applied it to each
> producer's direct input costs. For profit, [Commerce]
> totaled the reported profit before taxes for the eight
> Indian bearing producers and divided it by the total
> calculated cost of production ("COP") of goods sold.
> This percentage was applied to each respondent's total
> COP to derive a company-specific profit value.

Preliminary Results, 63 Fed. Reg. at 37,343 (citing Def.'s Mem.,

App. Ex. 9).

In the Final Results, during the review at issue, Commerce

concluded that an appropriate surrogate for determining overhead,

SG&A (excluding labor), and profit rates was the average annual

report data of six Indian producers of like or similar merchandise

at issue. See 63 Fed. Reg. at 63,850. Commerce explained that,

> [i]n deriving these ratios, [Commerce] used the average
> of the Indian producers' reported data with respect to
> the numerator (reported overhead and SG&A expenses) and
> the denominator (direct input costs excluding labor),
> thus yielding internally consistent ratios. These
> ratios, when multiplied by [Commerce's] calculated FOP
> values, constitute the best available information
> concerning overhead and SG&A expenses that would be
> incurred by a PRC bearings producer[] given such FOP
> data.

Id.

Commerce also explained its determination to use data from

only six of the Indian bearing producers and exclude data from

Asian Bearing Company ("Asian") and National Engineering Company

("NEI") by stating:

> [Commerce] agree[s] with respondents that data for Asian
> and NEI should be excluded from the average of reported
> costs for Indian bearings producers.  In the Final Re-
> sults of Antidumping Duty Administrative Review: Tapered
> Roller Bearings and Parts Thereof From the People's
> Republic of China, 56 FR 67,590, 67,594 (Dec. 31, 1991),
> [Commerce] stated that, "[Commerce] believe[s] that Asian
> is not an appropriate surrogate primarily because the
> Auditor's Report notes that the financial statements are
> not presented in accordance with the generally accepted
> accounting principles ("GAAP") of India." In this review,
> the Auditor's Report included with Asian's 1996-97
> financial statements expresses a clear reservation about
> how certain interest expenses (with their corresponding
> effects on depreciation and other expenses) have been
> reported, noting that the methodology is not in
> accordance with accounting principles recommended by the
> Institute of Chartered Accountants of India.  The
> Auditor's Report also notes that Asian continues to be a
> "sick" company as defined by India's Sick Industrial
> Companies Act.  Likewise, the auditors' endorsement of
> NEI's 1996-97 Financial Statements, as contained in the
> Auditor's Report, includes qualifications regarding,
> inter alia, the company's treatment of various overhead
> and SG&A expenses.
>
>      With regard to Timken's arguments concerning Asian
> and NEI, although [Commerce] recognize[s], as respondents
> argue, that the overhead and SG&A ratios for Asian and
> NEI generally are higher than those of the other six
> producers, this apparent difference is not [Commerce's]
> primary reason for excluding the Asian and NEI data.
> Rather, [Commerce] ha[s] excluded the data for Asian and
> NEI in calculating surrogate overhead, SG&A and profit
> ratios primarily because, according to the Auditor's
> Reports, the methodology used in recording and reporting
> the financial condition of these two companies appears,
> in certain instances, to be inconsistent with the
> methodology (i.e., Indian GAAP) used by the remaining six
> companies. Given these significant differences, it would

        be incongruous to combine the reported data of all eight
        companies.

Id. at 63,851.


        B.    Contentions of the Parties

            1.    Timken's Contentions

        Timken argues that, since the material and labor costs[18] of the

Indian bearing producers are higher than the surrogate material

values, Commerce should "adjust the denominator for purposes of

calculating ratios [that is, overhead and SG&A ratios] by the ratio

of surrogate raw materials and labor values [that is, Indonesian

steel and labor values] to the Indian producers' average materials

and labor costs [that is, the eight Indian producers' average

materials and labor costs]."    Timken's Mem. at 47; see Final

Results, 63 Fed. Reg. at 63,849.    Timken further maintains that

Peer Bearing 1998, 22 CIT 472, 12 F. Supp. 2d 445, and Timken 1999,

_____

        [18]    Commerce argues that "Timken [is] incorrect in its
statement that [Commerce] calculated overhead and SG&A costs as a
percentage of materials and labor costs [because] 'neither direct
or indirect labor was included in either the numerator or
denominator of the surrogate ratios.'"    Def.'s Mem. at 43-44
(quoting Final Results, 63 Fed. Reg. at 63,849).    Timken, in turn,
alleges that "[t]he record shows, however, that [Commerce]
calculated the profit ratio from the annual reports based on a
percentage of cost of production (including materials, overhead,
SG&A, and labor)."    Timken's Reply at 22-23 n.6 (citing Timken's
Mem. Pub. Doc. 304, Attachment 3).    The Court, however, is not
presented with any evidence that the fact that Commerce derived the
profit ratio from the annual reports automatically means that
labor costs were included or excluded.

23 CIT 509, 59 F. Supp. 2d 1371, are distinguishable from the case at bar because in those cases, Commerce "relied on the annual report data of one Indian bearings producer to calculate ratios for overhead, SG&A and profit." Timken's Reply at 23; see also Timken's Mem. at 48 (stating that "there is a significant disparity between the Indian material and labor costs and the surrogate statistics is supported by the annual reports of eight Indian bearing producers"). Alternatively, Timken proposes that rather than use the eight Indian producers' average materials and labor costs, Commerce should have used the reported costs of Asian since it "only produces antifriction bearings and identified raw material input products in its annual report." Timken's Mem. at 21.

Timken also contends that Commerce should have made an adjustment for import duties incurred by the Indian bearing producers because "material costs in the annual reports included high import duties." Timken's Reply at 22; see Timken's Mem. at 47, 49. In particular, Timken argues that, despite Commerce's argument that the record does not contain the information necessary regarding the amount of import duties included in Commerce's calculation, Commerce could have calculated the import duties of three companies (SKF, ABC and NRB) because the record shows "the amount and percentage of raw materials imported" and the "cost,

insurance, and freight, excluding import duties" of imported materials. Timken's Reply at 24.

Finally, Timken alleges that Commerce's exclusion of Asian and NEI from the calculation of overhead, SG&A, and profit ratios "was an arbitrary departure from agency practice and should be rejected." Timken's Mem. at 50. In particular, Timken maintains that "the aggregate annual report data of all eight Indian bearing producers would have been more descriptive of the variety of companies in China than the data of only six producers . . . [,and] annual reports [of, Asian and NEI] included the figures necessary to adjust those annual reports to be GAAP-compliant." Id. at 51-52 (citing Timken's Mem. Pub. Doc. 290 and 129); see also Timken's Reply at 25 (Commerce "decided to reject otherwise desirable annual reports based on easily curable grounds without explanation"). Moreover, relying on Notice of Final Determination of Sales at Less Than Fair Value: Bicycles From the People's Republic of China ("Bicycles From the PRC"), 61 Fed. Reg. 19,026, 19,039 (Apr. 30, 1996), Timken argues that Commerce's refusal to use Asian in Commerce's calculation because of Asian's "sick" financial status "was an unexplained departure from agency practice" because Commerce "has previously made it clear that '[w]hether or not a company is profitable . . . is not necessarily a reason for rejecting that company's data for purposes of surrogate valuations

for factory overhead and SG&A expenses.'"   Timken's Mem. at 52

(quoting Bicycles From the PRC, 61 Fed. Reg. at 19,039).

### 2.    Commerce's Contentions

Relying on Peer Bearing 1998, 22 CIT at 481, 12 F. Supp. 2d at

455, and Timken 1999, 23 CIT 509, 59 F. Supp. 2d 1371, Commerce

maintains that "Commerce[] [has an] authority to select . . .

surrogate values . . . without adjustment."[19]  Def.'s Mem. at 44.

Commerce further maintains that the methodology used in the case at

bar allowed Commerce to derive internally consistent ratios of the

Indian producers' overhead and SG&A expenses.  See Def.'s Mem. at

44; see also Final Results, 63 Fed. Reg. at 63,850.  Commerce

points out that doing otherwise, that is, adjusting the underlying

values of the Indian producers

> including the proposed alternative adjustment based
> solely on Asian Bearing's reported costs[,] would itself
> distort the ratios rather than correct the alleged
> distortions in [Commerce's] calculations.

Final Results, 63 Fed. Reg. at 63,850.

Commerce also argues that it properly declined to deduct the

import duties "from the reported material costs [of] the Indian

producers when calculating the overhead and SG&A ratios" because

---

[19]  Commerce argues that "Timken's attempt to distinguish this
case from Peer [Bearing 1998] is unavailing. . . . Contrary to
[Timken's] position, there is no meaningful difference between the
one producer at issue in Peer [Bearing 1998] . . . and the eight
producers involved here."  Def.'s Mem. at 44-45.

there was "no evidence as to the amount of duties, if any, included in the Indian producers' reported costs." Id.; see Def.'s Mem. at 45. Commerce points out that "'Timken has not provided any information regarding the amount of import duties that are included, nor has Timken provided a means of identifying and eliminating such duties from [Commerce's] calculations.'" Def.'s Mem. at 45 (quoting Final Results, 63 Fed. Reg. at 63,850).

Commerce further contends that it properly used data from only six of the Indian bearing producers and excluded the annual report data contained in Asian and NEI when calculating the ratios for overhead, SG&A and profit. See Def's Mem. at 46-48. Commerce explained that it rejected Asian and NEI annual report data because Commerce

> relied upon statements made by the companies' independent auditors that indicated that "the methodology used in recording and reporting the financial condition of these two companies appears, in certain instances, to be inconsistent with the methodology (i.e., Indian GAAP) used by the remaining six companies."

Id. at 46 (quoting Final Results, 63 Fed. Reg. at 63,851); see also Def.'s Mem. at 46-48.

Moreover, relying on Writing Instrument, 21 CIT at 1195, 984 F. Supp. at 639, Commerce argues that "in determining whether a surrogate value represents the best available information, Commerce is authorized to determine the reliability of that value and, if it

is established that the value is unreliable, decline to use that data for purposes of factor valuation." Def.'s Mem. at 47-48.

### C. Analysis

"In the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable." Timken 1999, 23 CIT at 516, 59 F. Supp. 2d at 1377; see also Chevron, 467 U.S. at 844-45. This Court has consistently articulated that Commerce's authority to select appropriate surrogate data includes the authority to base a calculation on these data without adjustment, if such method is reasonable. See Peer Bearing 2001, 25 CIT at __, 182 F. Supp. 2d at 1305; Timken 2001, 25 CIT at __, 166 F. Supp. 2d at 625; Timken 1999, 23 CIT at 516, 59 F. Supp. 2d at 1377; Peer Bearing 1998, 22 CIT at 482, 12 F. Supp. 2d at 456; see also Chevron, 467 U.S. at 844-45.[20]

In the case at bar, Commerce derived overhead, SG&A, and profit rates from the average annual report data of six Indian producers of like or similar merchandise. Commerce explained that the adjustment suggested by Timken would distort the experience of

---

[20] The Court is not persuaded by Timken's argument that Peer Bearing 1998, 22 CIT 472, 12 F. Supp. 2d 445, and Timken 1999, 23 CIT 509, 59 F. Supp. 2d 1371, are distinguishable from the case at bar because in this case Commerce relied on more than one Indian bearings producer to calculate ratios for overhead, SG&A and profit.

the Indian producers rather than cure any distortion in Commerce's calculation.  See Final Results, 63 Fed. Reg. at 63,850.  Moreover, although the Court could certainly question the perfection of Commerce's approach, the Court holds that, under the circumstances, Commerce acted reasonably in not subtracting import duties from the Indian producers' data.[21]

The Court finds that Commerce attempted to capture in its rate calculation the surrogates' (that is, the six Indian producers') experience in incurring overhead and SG&A expenses, and created a reasonable internally consistent ratio that, as imperfect as it might be, does not violate the boundaries set by 19 U.S.C. § 1677b(c).  The mere fact that one of the actual factors is likely to be higher while the other one is likely to be lower than the corresponding data derived from the records of the Indian producers does not empower the Court to uphold Timken's suggestion as a more palatable alternative.  See American Spring Wire, 8 CIT at 22, 590 F. Supp. at 1276 (stating that "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably

---

[21]    The Court disagrees with Timken's argument that Commerce could have calculated import duties of SKF, ABC and NRB because the record shows "the amount and percentage of raw materials imported" and the "cost, insurance, and freight, excluding import duties" of imported materials.  Timken's Reply at 24.  The Court finds that it does not follow from this argument that Commerce knows how much of these import costs are attributable to import duties.

have made a different choice had the matter been before it <u>de
novo</u>'" and quoting <u>Penntech Papers</u>, 706 F.2d at 22-23 (quoting, in
turn, <u>Universal Camera</u>, 340 U.S. at 487-88)).

Finally, the Court finds that Commerce acted reasonably within
its discretion in excluding the annual report data contained in
Asian and NEI when calculating the ratios for overhead, SG&A and
profit.  In particular, Commerce pointed out that it

> relied upon statements made by the companies' [that is,
> Asian's and NEI's] independent auditors that indicated
> that "the methodology used in recording and reporting the
> financial condition of these two companies appears, in
> certain instances, to be inconsistent with the
> methodology (<u>i.e.,</u> Indian GAAP) used by the remaining six
> companies."

Def.'s Mem. at 46 (quoting <u>Final Results</u>, 63 Fed. Reg. at 63,851).

Timken may not usurp Commerce's role as fact finder and
substitute their analysis for the result reached by Commerce.

Accordingly, the Court sustains Commerce's determination to
use the average annual report data of six Indian bearing producers
as a surrogate for determining overhead, SG&A and profit rates as
reasonable, in accordance with law and supported by substantial
evidence.

### CONCLUSION

This case is remanded to Commerce to: (1) provide the Court
with an explanation as to why export statistics from Japan to India

are not the "best available information" for the purpose of choosing a surrogate to value hot-rolled steel bar used to produce TRB cups and cones; and (2) explain whether or not the American Metal Market prices can serve as an alternative surrogate to value scrap and, if Commerce concludes that the American Metal Market prices present the "best available information" for the purpose of such surrogate evaluation, to recalculate Commerce's determination accordingly.  All other issues are affirmed.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    April 22, 2002
          New York, New York